No. 32,472

Ellis Clark, as Receiver for The Pretty Prairie Coöperative Grain Company, *Appellee,* v. Fred V. Pargeter et al., *Appellants.*

(52 P. 2d 617)

Opinion filed December 7, 1935.

*C. M. Williams, D. C. Martindell, W. D. P. Carey, J. N. Tincher* and *A. L. Oswald,* all of Hutchinson, for the appellants.

*A. C. Malloy, Roy C. Davis, Warren H. White, Frank S. Hodge* and *Ellis Clark,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

Thiele, J.: The question in this appeal is who is entitled to a certain promissory note.

The facts giving rise to the controversy may be summarized as follows: Some years prior to 1930, the Pretty Prairie Coöperative Grain Company was incorporated with an authorized capital of $50,000 divided into 250 shares of a par value of $200 each. It engaged in business, and on June 1, 1930, stock to the amount of $4,800

had been subscribed and paid for by thirty-six stockholders. Apparently the business had been conducted at a loss, for about the latter date it was determined to get additional capital but, before seeking it, that the impaired capital should be made good. The financial statement of June 1, 1930, showed that taking the assets at values therein fixed and offsetting the admitted liabilities, to put the outstanding capital stock at par required payment into the treasury of $13,868.44. To accomplish this end, and so that future stockholders paying par for treasury stock would be protected, twenty-four stockholders executed to the order of the company their promissory note, dated June 1, 1930, due thirty days after date, for the sum of $13,868.44. At the same time, a contract was made between the company, party of the first part, and the twenty-four signers, parties of the second part, a "whereas" clause reciting second parties executed the notes as accommodation makers, and the contractual clause being as follows:

"And we and each of us, do further authorize and instruct the officers of the said Pretty Prairie Coöperative Grain Company to retain the net profits accruing and earned by said company belonging to each of us and apply the same in payment of the said promissory note hereinbefore described, in whole if our share of the net profits be sufficient to pay and liquidate said note, and if not, that they be applied to the part payment of said note, and if said net profits be more than sufficient to pay said note in full, that the remaining portion thereof shall be apportioned by the officers of said company to each of us in accordance with our respective shares owned by each of us."

Some payments were made on the note which we need not notice. Treasury stock was thereafter sold at par. On the balance sheet of the company of May 31, 1931, the note was carried as an asset at $12,878.89, which seems to have been the balance due on the principal, and on the balance sheet of May 31, 1932, it was carried as an asset at the same figure. At least for a time prior to May 12, 1933, the business of the company was unprofitable, for on that date it was indebted to defendant McGowan, who was not a maker of the note, in the sum of $200, to defendant Pargeter, who was not a signer, for wheat delivered in the sum of $972.90, and to a number of the signers of the note, in varying amounts for wheat delivered. The company was also indebted to other creditors, and was, in fact, insolvent. It is here noted that certain receipts were set up in an account and carried as "surplus," applicable to the payment of the note. At a special stockholders' meeting on April 22, 1933, the following proceedings were had:

"It was moved and seconded that we declare all future settlement wheat sold at the price of 53 cents per bushel. Motion carried. It was moved and .seconded that our nonstockholders have preferred claims in payment for future settlement wheat. Motion carried."

. We note there was controversy as to whether in fact there was any surplus, and if so whether it belonged to the signers of the note or to all of the stockholders, that is, the corporation. At a special stockholders' meeting held May 5, 1932, it was voted to apply this "surplus" of $3,388.37 on the note, and a motion was made and carried to authorize the board of directors to collect the note. Notwithstanding the action at the special stockholders' meeting on April 12, 1933, the company, after giving credit for the "surplus" of $3,388.37, assigned the note to the defendants, who were all stockholders and creditors of the company, the consideration being the satisfaction of McGowan's note for $166.30, his salary claim for $33.70, and the cancellation or satisfaction of claims for wheat previously delivered by the remaining assignees in varying amounts at the stipulated price of 53 cents per bushel. At a stockholders' meeting held June 2, 1933, it was voted that the company deed the elevator and property covered by the mortgage of $7,500 to the mortgagee in full satisfaction.

On June 7, 1933, in an action in the district court, the company was declared insolvent, and a receiver was appointed. The assets of the company which he received consisted of some personal property and equipment, a small stock of goods and about $1,000 of accounts receivable. The liability for wheat received and not paid for, according to claims filed in the receivership, was about $15,000. There were also some other liabilities, and in addition thereto, there are to be considered the claims offset against the note. The receiver brought this action to set aside the credit given on the note and the assignment of it, and to recover possession of the note.

At the trial, the above facts were either admitted or developed by the evidence and it is not deemed necessary the evidence be further detailed. The trial court, in a written decision, held there was no surplus of $3,388.37 and that it was wrongfully applied and was not a proper credit; that the note was not an accommodation note nor were the signers accommodation signers within the meaning of R. S. 52-306; that the note represented a voluntary assessment by the then stockholders in order to sell stock to new purchasers at par; that although a corporation when insolvent may

prefer creditors, this note was an obligation for capital stock and as such constituted a trust fund for the benefit of general creditors of the corporation. The journal entry of judgment shows the trial court held the receiver should recover possession of the note; that the note was not subject to the claimed credit of $3,388.37, nor subject to any credit claimed to be due the defendants on account of wheat stored with the insolvent corporation or on account of other obligations due from the corporation, but that they had claims as general creditors, and that the assignment should be set aside. A motion for a new trial was denied, and the defendants appeal.

The question presented by the appeal is this: Where stockholders of a corporation, who have paid their original stock subscription in full, deliver to the corporation their note for the purpose of making good impaired capital so that the company may continue in business and sell treasury stock at par, and the note is thereafter carried as an asset and stock is sold, and thereafter some of the makers of the note and other stockholders and other persons became creditors of the company, which becomes insolvent, does the note become an asset of the corporation in the nature of a trust fund for the benefit of all the creditors, or may the corporation assign the note to ten stockholders, eight of whom are makers of the note, in satisfaction of claims totaling the balance said to be due upon the note?

Appellants' principal complaint is based on the contention the trial court erred in holding that the note, carried as an asset of the corporation until it became insolvent, constituted a trust fund for the benefit of all the creditors of the corporation, and prevented the corporation from preferring creditors. With respect to the contention made by the pleadings that the note was an accommodation note and without consideration, it might be sufficient to say that the contract made at the time it was given, and a paragraph of which is quoted above, shows an arrangement for payment of the note which is inconsistent with any claim of accommodation. Although the contract was not as complete, the contract and the admitted facts show a situation quite similar to that in *Farmers Equity Coöp. Ass'n v. Tice*, 122 Kan. 127, 251 Pac. 421, where it was said:

"The defendant was a stockholder in the plaintiff association and interested in its welfare and progress. He was interested in seeing that its business was carried on. The execution by the other stockholders of their notes for the benefit of and to aid the company in which the defendant was interested was a valuable consideration for the execution of his note." (p. 130.)

And the maker of the note was held liable. A similar situation was involved in *Farmers Coöperative Union v. Reynolds*, 127 Kan. 16, 272 Pac. 108, where it was held: .

"Where a corporation is in financial difficulties, its shareholders may bind themselves by resolution at a stockholders' meeting and by execution and delivery of their several promissory notes responsive thereto, to strengthen its credit, and to guarantee the members of the corporation's board of directors against liability or loss through their individual obligations on behalf of the corporation; and a defense to such a stockholders' note based upon want of consideration and want of mutuality is not good." (Syl. ¶ 3.)

We hold the note was not given for the accommodation of the grain company nor was it without consideration flowing to the makers.

It is urged that under *Plow Co. v. Rude*, 60 Kan. 145, 55 Pac. 848, where this court held:

"In the absence of charter or statutory restrictions, and in the absence of actual fraud, a corporation, though insolvent, and though it has ceased, or determined to cease, doing business, may prefer certain creditors over others, whenever a natural person could do so" (syl. ¶ 2).

a valid preference could be made. In that case this court refused to apply the trust-fund doctrine to the facts of the case. It must be borne in mind, however, that the case did not treat of facts as we have them in the case at bar, for there the preferred creditor was not an officer, agent, director or stockholder of the insolvent company. In the above decision attention is directed to *Hays v. Citizens' Bank*, 51 Kan. 535, 33 Pac. 318, where it was held:

"The directors of an insolvent corporation, and who are creditors of the same, cannot, while they continue in the control of its affairs and assets, take any advantage of their position to secure preference or advantage for themselves over other creditors, but must share ratably with the other general creditors in a distribution of the company's assets." (Syl.)

Appellants also rely on *Morisette v. Howard*, 62 Kan. 463, 63 Pac. 756, where it was held:

"A strictly private corporation, owing no peculiar duties to the public, has the same dominion over and power to dispose of its property that an individual has; and, when the exigencies of its business render it necessary, it may, if done in good faith and with the assent of its stockholders, discontinue business and dispose of its entire assets and property, with a view of paying its debts and closing up the affairs of the corporation." (Syl. ¶ 1.)

The case is distinguishable from the case at bar, for there the purchaser claiming right of possession of certain corporate assets was not connected with the corporation.

In *Bridge Co. v. Fowler*, 55 Kan. 17, 39 Pac. 727, it was held:

"Where a corporation is heavily indebted to its officers and stockholders, and such officers and stockholders enter into an agreement to discontinue business and divide and distribute the entire capital and assets of the corporation among themselves in payment of the indebtedness which they hold against the corporation, and when in accordance with the agreement they have wound up the business and distributed the assets, and there remains a large indebtedness unprovided for, the transaction will be deemed to be invalid as to any excluded creditor. In such case the property and assets of the corporation will be deemed to be held in trust for the payment of the debts of the corporation, and any excluded creditor will be entitled to pursue it into the hands of any member of the corporation or other person who has taken the same with full knowledge of the facts; and if it has passed out of their hands they may be compelled to account to such creditors, and to contribute pro rata toward the payment of the unpaid debts of the corporation to the extent of the fund so misapplied." (Syl. ¶ 1.)

In *Brokerage Co. v. Dunn*, 91 Kan. 64, 136 Pac. 939, one Chesebro started in business and purchased goods from the brokerage company which he had not paid for when he and others formed a corporation, hereafter called the fruit company, which assumed the obligation, and the brokerage company therefore claimed to be a creditor and entitled to receive the full amount of its claim. Appellee claimed that Collins of the brokerage company was himself the fruit company, and that shares of the fruit company were full payment for all the assets and credit turned over to it. Chesebro testified that Collins furnished him all the goods when he first started business, later procured the incorporation of the fruit company, and that stock issued to Chesebro belonged to Collins, who later advanced moneys for use of the fruit company. We are not concerned with the details of the claim, etc., but in discussing the question of right of off-set, it was said:

"If, as the testimony tends to show, Collins was the Garden City Fruit Company, and that he turned over whatever interest he had in that company, whether it be goods or claims, to pay for the shares of stock issued to Chesebro for him, he is not entitled to set up any claim that he owed to himself as a liability against the corporation. So far as creditors are concerned, the capital stock must be treated as a trust fund pledged for the payment of the debts of the corporation, and one who subscribed for stock must pay for the same either in money or money's worth. (10 Cyc. 472.)" (p. 66.)

And the holding of the court, as stated in the syllabus, was:

"The capital stock of a corporation is a trust fund for the benefit of the general creditors of a corporation, and one who subscribed for shares of stock must pay for them either in money or in money's worth." (Syl. ¶ 1.)

In *Bank v. Milling Co.*, 101 Kan. 446, 167 Pac. 1036, the milling company, being indebted to the bank for a large sum, entered into an agreement to turn over its property to be converted and sold and the proceeds applied to the payment of the debt. A few days after the agreement was made, a Mrs. Shepard brought suit against the milling company to rescind a sale of milling company stock to her. Ultimately she prevailed. During the pendency of her suit, receivers were appointed for the milling company and sold its assets. Mrs. Shepard intervened in that action and asked for an order directing payment of her claim. The trial court ruled that she had no right to participate in the funds to the detriment of the bank, and she appealed. This court quoted with approval the definition of the trust-fund doctrine in *Hospes v. Northwestern Manuf'g & Car Co.*, 48 Minn. 174, 50 N. W. 1117, reciting:

"The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. People deal with it and give it credit on the faith of it. They have a right to assume that it has paid-in capital to the amount which it represents itself as having, and if they give it credit on the faith of that representation, and if the representation is false, it is a fraud upon them; and, in case the corporation becomes insolvent, the law upon the plainest principles of common justice says to the delinquent stockholder, 'Make that representation good by paying for your stock.'" (p. 450.)

and held that Mrs. Shepard had a right to participate, saying—

"When a stockholder has satisfied all his obligations as such, and there remains nothing by way of unpaid subscription or liability growing out of his relation as stockholder, and he is in good faith a creditor of the corporation, he stands on an equal footing with other creditors and has the same right to treat the corporation as a stranger and adversary as they have. Under such circumstances he is not required to stand back until other creditors are satisfied, but may proceed along with them on equal terms." (Syl. ¶ 1.)

While the briefs contain many citations of authorities defining the trust-fund doctrine, and appellants cite those criticising various applications of it, we do not deem it necessary to review them, for here it is undisputed that the note, although not given for original purchase of stock, was given to make good an impaired capital, it was thereafter carried as an asset of the company, other treasury stock was sold on the assumption the impairment of the capital had been made good, and the note was capital of the company and a part of the fund to which creditors were entitled to look for satisfaction of their claims.

The question whether an insolvent or failing corporation may prefer a stockholder who is a creditor is one on which there is considerable difference of opinion, although in 14a C. J. 901 it is said:

"The weight of authority, however, is to the effect that the corporation cannot prefer its own stockholders over its outside creditors."

However, in an annotation on right of corporation to prefer creditors, 19 A. L. R. 320 *et seq.*, under that portion dealing with stockholders (page 356), it is said:

. "It is generally held that a preference by a corporation to a stockholder is valid to the same extent as if he were a general creditor. The reason advanced for allowing the preference is that a stockholder does not, except in the exercise of his right to participate in the selection of its officers, have any control over a corporation not equally open to other creditors. If he becomes a creditor he has the same right to receive payment, and the same means of redress in case it is not made, as do the other creditors." (Citing cases.)

And on page 357 it is said several jurisdictions deny the right of an insolvent corporation to prefer a creditor who is a stockholder, citing cases. No Kansas cases are noted in either division.

In 8 Thompson on Corporations (3d ed.), page 300 *et seq.*, is a discussion of such power, wherein it is said:

"It is a well-settled principle of law that the stockholder who is not a director or other officer may deal with the corporation and the corporation with him in all respects as if he were in no wise interested in the corporation, and the fact of his being a stockholder in no wise detracts from his rights as a creditor. Positive as these rules are, it must be admitted that third persons who are creditors have not an equal advantage with a stockholder. The suggestion as made by some courts that stockholders are afforded special opportunities to take advantage of their knowledge of the embarrassed condition and insolvency of the corporation, has not been satisfactorily answered by the mere assertion that stockholders do not, except in the election of managing officers, have any control over the corporation not equally open to other creditors, and that the corporate business is conducted by instrumentalities created from the charter and not by the stockholders. This suggestion entirely overlooks the pertinent and powerful fact that a stockholder has at all times the right to inspect the corporate books and may be able at any time, with his finger on the pulse of the patient, to know its failing condition, and either demand security for its claim, or proceed to obtain a preference by taking judgment and levying execution on the corporate property and thus by reason of his relation obtain a preference that ordinary creditors are not able to obtain. In line with this view there are numerous holdings against the right of a sotckholder to secure a preference over other corporate creditors." (p. 301.)

(See, also, 15 Fletcher on Corporations, p. 718, § 7484.) An examination of cases cited in support of the above texts shows those involving rights under preferred stock issues, preferences acquired

by loans on a present consideration, others affected by statutory provisions, etc. A discussion of the right is also found in 7 R. C. L. 758 *et seq.*, where the division of authority is noted, it being there said the weight of authority allows such a preference. In discussing the view denying validity, it is said:

"In jurisdictions in which the trust-fund doctrine obtains, an insolvent corporation, of course, has no power to prefer the debt of one of its officers or stockholders, and many courts take the view that an insolvent corporation, though the general right to prefer creditors may exist, cannot prefer a creditor who is also a director or managing officer of the corporation." (pp. 759, 760.)

It may well be argued that the officers of the corporation, being in active management, are fully aware of the financial condition and should not be permitted to take advantage of their knowledge to the prejudice of general creditors, but that the stockholders, having voted for the directors, are then in a position to deal with the corporation in the same manner as a stranger to it. This argument is of considerable weight when applied to such corporations as the United States Steel Corporation, the Pullman Car Company, and others of similar size with widely scattered stockholders, but the greater number of corporations in this state include those where the stockholders have a much more intimate knowledge of what the corporation is doing, its financial situation, etc. In view of the fact the trust-fund doctrine has been recognized as the law of this state for over forty years, it seems the better rule to follow that when the corporation is insolvent or in a failing condition, it should not be permitted to so deal with its shareholders who are creditors that they receive a preferential right to the assets of the corporation to the detriment of the general creditors. They should receive their dues ratably with other general creditors.

Insofar as this case is concerned, however, there is further reason why appellants should not prevail. The record does not show that any of the assignees of the note were directors; in fact, it shows only inferentially there was an active board of directors; but it does show that the giving of the note was arranged at a stockholders' meeting. The determination to settle with the owners of wheat delivered and unpaid for, at a stipulated price per bushel, and that nonstockholders should have preference in settlement, the delivery of the mortgaged real estate to the mortgagee in satisfaction of that claim, and the authorization to the board of directors

to collect the note were all matters that were considered and acted on at stockholders' meetings. The stockholders were actually directing the conduct of the company's business to a considerable extent. Cases having to do with preferences to directors may not be strictly in point, but in view of the facts of the case before us may be persuasive.

*Jackman v. Newbold,* 28 F. 2d 107, 62 A. L. R. 739, bears on the general proposition involved. The directors of a construction company had advanced large sums of money to enable it to carry on. Ultimately the company concluded to wind up its affairs. In so doing, it transferred to the advancing directors paving bonds it had received for work done, in satisfaction of the directors' claims, leaving little for general creditors. A receiver was appointed and brought suit to recover the bonds or their value, and the directors attempted to justify what had been done. From an adverse decision, director Jackman appealed to the circuit court of appeals. In disposing of his contentions, the court, in part, said:

"However, where a corporation is insolvent in fact, or so nearly so that insolvency is practically certain, director creditors should not be permitted to appropriate the assets of the corporation to secure or pay a past indebtedness to the prejudice of other creditors. . . .

"The law applicable to this situation is not difficult. It is merely common sense and common honesty, applied in the interest of fair dealing. In the vigorous opinion of Judge Philips in *Northwestern Mut. Life Ins. Co. v. Cotton Exchange Real Estate Co.* (C. C.) 70 F. 155, 161, he said: 'A sound public policy, in my judgment, demands that when a business corporation has reached a point in its affairs when its directors know that it cannot pay its debts, and for the lack of sustenance, cannot longer do business, or cannot "act up to the design of its creation," it is then, to all intents and purposes, insolvent. In such conjuncture its directors ought not to be permitted to take advantage of their position as managing officers to appropriate its remaining assets to the payment of their unsecured debts, to the exclusion of other unsecured creditors. Until overruled in this judgment, I shall continue to so administer the law.' This court in *Stuart v. Larson et al.,* 298 F. 223, 38 A. L. R. 79, reviewed the authorities and indorsed this language of Judge Philips. . . . Appellant as to his unsecured loans should take his place with the other general creditors and receive his fair pro rata. To permit an arrangement by the directors of a failing, if not an absolutely insolvent, corporation, whose stockholders months before had voted to liquidate the business of the corporation, to appropriate most of the assets of the company in payment of their own unsecured debts, thus according themselves preferential treatment at the expense of the other general creditors, would be in equity an abhorrent proposition." (pp. 111, 113.)

If it be assumed a corporation may prefer a stockholder creditor, there is another reason why appellants here should not prevail. At the time the note was assigned, the assets of the company consisted of the elevator, which was within a few days conveyed to the mortgagee in satisfaction of the debt, cash, accounts and notes receivable and inventories, total $2,554.93 as of May 31, 1933, stock of a coöperative commission company carried at $1,626.77, and the note in question. The effect of the assignment was to transfer the note, or substantially all of the assets of the company, to the assignees. This was not authorized or approved by the vote of the holders of not less than four fifths in amount of the outstanding shares of capital stock, in the manner required by Laws 1931, ch. 154, sec. 1, R. S. 1933 Supp. 17-620a. (See *First National Bank v. Paramount Transit Co.*, 139 Kan. 808, 33 P. 2d 300.)

And finally, another reason why appellants should not prevail is that under decisions noted the "trust-fund doctrine" is followed in this state. The note in question is a part of that trust fund, and the action is to follow and recover it. The undisputed evidence is that the assignees of the note took the same with notice of its character and gave nothing for it beyond the discharge of a preexisting debt. Under such circumstances the receiver as trustee was entitled to possession. (See *Clingman v. Hill*, 113 Kan. 632, 215 Pac. 1013; *Levant State Bank v. Shults*, 142 Kan. 318, 47 P. 2d 80.)

Appellants argue that if it be held the note was given for stock, it violated the provisions of Laws 1929, ch. 140, sec. 17 (R. S. 1933 Supp. 17-1239) in that it contained no requisite statement as "Given for shares in ——," and is therefore uncollectible. It does not appear this defense was made in the trial court, but if it were, it would not avail, for by section 2 of the act (R. S. 1933 Supp. 17-1224) securities of a coöperative association are exempt. The record does not disclose fully the nature of the grain company, but its name contains the word "Coöperative," which cannot be used by other than coöperative incorporations. (See R. S. 17-1515 and R. S. 1933 Supp. 17-1627.)

The judgment of the trial court is affirmed.